6 of 100 DOCUMENTS

AHTNA, INC.

IBLA 83-1005

Interior Board of Land Appeals

*87 IBLA 283; 1985 IBLA LEXIS 129*

June 25, 1985, Decided

**ACTION:**
[**1]

[*283] Appeal from decisions of the Bureau of Indian Affairs declaring four Native corporations (Little Lake Louise, Twin Lakes, Lower Tonsina, and Slana), located within the Ahtna, Inc., Region ineligible for status as Native groups. AA-10537, AA-10437, AA-10535, AA-10536.

Affirmed.

**HEADNOTES:**

1. Alaska Native Claims Settlement Act: Conveyances: Native Groups

A determination by the Bureau of Indian Affairs to deny a Native corporation status as a Native group because members of the group did not constitute a majority of the residents of the locality on Apr. 1, 1970, will be affirmed where it is based on a thorough field investigation, supported by numerous affidavits, and meets the criteria of 43 CFR 2653.6(a)(4).

2. Regulations: Force and Effect as Law -- Regulations: Validity

The Board of Land Appeals has no authority to declare invalid duly promulgated regulations of this Department. Such regulations have the force and effect of law and are binding on the Department.

APPEARANCES:

Robert M. Goldberg, Esq., Thomas G. Beck, Esq., Anchorage, Alaska, for appellants;

James R. Mothershead, Esq., Office of the Regional Solicitor, Anchorage, Alaska, for the Bureau of Indian Affairs; [**2]

M. Francis Neville, Esq., Assistant Attorney General, for the State of Alaska, intervenor.

**OPINIONBY:** HORTON

OPINION BY CHIEF ADMINISTRATIVE JUDGE HORTON

The Native corporations Little Lake Louise, Inc., Twin Lakes, Inc., Lower Tonsina, Inc., and Slana, Inc., have

EXHIBIT 13
Page 1 of 9

appealed from June 16, 17, and 20, 1983, determinations by the Juneau Area Director, Bureau of Indian Affairs (BIA), issuing the corporations certificates of ineligibility for status as Native groups. The above Native groups are located within the Ahtna, Inc., Region. The certificates of ineligibility were issued because on April 1, [*284] 1970, the members of each group failed to constitute a majority of residents of the locality where the group resides, as required by 43 CFR 2653.6(a)(4).

On December 18, 1971, Congress passed the Alaska Native Claims Settlement Act (ANCSA), *43 U.S.C. §§ 1601*-1627 (1982), to provide a "fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." *43 U.S.C. § 1601*(a) (1982). Pursuant to *43 U.S.C. § 1613*(h)(2) (1982), the Secretary of the Interior is authorized to "withdraw and convey to a Native group that does not qualify as a Native village, [**3] if it incorporates under the laws of Alaska, title to the surface estate in not more than 23,040 acres surrounding the Native group's locality." Such a conveyance would be made from "2 million acres of unreserved and unappropriated public lands located outside the areas withdrawn by sections 1610 and 1615 of this title" *43 U.S.C. § 1613*(h) (1982).

"Native group" is defined in *43 U.S.C. § 1602*(d) (1982) as "any tribe, band, clan, village, community, or village association of Natives in Alaska composed of less than twenty-five Natives, who comprise a majority of the residents of the locality." A "Native group" is distinguished from a "Native village" on the basis of numbers of Natives. A "Native village" is composed of 25 or more Natives. *43 U.S.C. § 1602*(c) (1982).

The Secretary promulgated regulations at 43 CFR Subpart 2653, regarding, inter alia, the eligibility of Native groups to select lands. The regulations at 43 CFR 2653.0-5(c) provide that a Native group will be "composed of less than twenty-five, but more than three Natives."

Here, the four Native corporations filed their Native group applications with the Juneau Area Office, BIA, in December 1975, pursuant to section [**4] 14(h)(2) of ANCSA, *43 U.S.C. § 1613*(h)(2) (1982). Field investigations were conducted during September 1982 by a BIA realty specialist and two field investigators. Their findings and conclusions are set forth in a Report of Investigation (report) for each corporation.

Little Lake Louise, Inc. AA-10537

The report indicates that Little Lake Louise, Inc., consists of five enrollees: Donald MacArthur, Jr., Douglas MacArthur, Eva Maria MacArthur, Mary McKay, and John Patrick Sabo. The report states that affidavits were obtained from Donald MacArthur, Jr., Eva Maria MacArthur, and John Patrick Sabo, and that Douglas MacArthur did not return the affidavit questionnaire sent him. The report recites:

Affidavits also indicate that of the 5 Native group enrollees only 3 resided in the Little Lake Louise, Inc., area on April 1, 1970. They were: Donald MacArthur, Jr., Eva Maria MacArthur, and Douglas MacArthur. The 3 were members of a single household. This household is located upon homestead property belonging to Donald MacArthur, Sr., and Native allotment property of Eva Maria MacArthur.

[*285] Mary L. McKay, also enrolled to Little Lake Louise, Incorporated, did not reside [**5] there in 1970. The fifth enrollee is John Patrick Sabo and he did not reside at Little Lake Louise, until September 1971 at which time he was adopted by the Sabo family (see Exhibit 2, Appendix B). The Sabo family owned and operated a lodge on Lake Louise approximately 3-1/2 miles southeast of the MacArthur place. This fact was corroborated by Barbara Plouffle who worked for the Sabos in 1970, and by Paul Holland, owner of the Evergreen Lodge and area resident since 1974.

Also living in the Little Lake Louise area were Bill Poe, Betty Poe, and their 2 children; Donald MacArthur Sr., Bernard Sabo, Judy Sabo, Ann Sabo, Bob and Barbara Plouffle and their child. All non-Natives.

Counsel for appellants asserts that according to the affidavits of Eva Maria and Donald MacArthur, Jr., both John Patrick Sabo and Mary McKay were residents of the locality on April 1, 1970, and that only five non-Natives were living there at the time. Counsel also states that a hearing is necessary "to determine why Douglas MacArthur's

EXHIBIT 13
Page 2 of 9

affidavit was ignored, and to determine who exactly was a resident of Little Lake Louise as of April 1, 1970" (Statement of Reasons at 3).

BIA's answer responds to the [**6] foregoing argument as follows:

The Appellant asserts that enrolled members John Sabo and Mary McKay should have been included as residents of the locality. While Eva Marie MacArthur's affidavit, dated September 8, 1982, shows that Mary McKay's father built a house at Little Lake Louise at some unspecified time (#11), n1 Ms. MacArthur did not include Mary McKay among the enrollees who actually resided in the locality on April 1, 1970 (#12). Neither the affidavit of John P. Sabo's guardian (B. G. Sabo) (#14) or of Donald N. MacArthur (#12) show that Mary McKay was an actual resident on April 1, 1970. In evaluating the three affidavits, BIA correctly made a factual judgment giving weight to the failure of any of the affidavits to include Mary McKay among actual residents on April 1, 1970. Absent a conflict on this factual matter, no hearing is necessary on such point.

   n1 The cited number (e.g., #1) refers to the numbered response in the affidavit.

While Ms. MacArthur and Donald N. MacArthur indicated that John Sabo [**7] was living in the locality on April 1, 1970 (#12), his guardian, B. G. Sabo, indicated that he and his wife did not adopt John Sabo (born in 1969) until the latter moved to the locality in September of 1971, to live with the Sabo's in their home in Evergreen Lodge (#2 and #3). BIA correctly gave greater weight [*286] to the guardian's statement of residency in concluding that John Sabo did not reside in the locality on April 1, 1970.

The affidavits of Eva Marie MacArthur and Donald MacArthur show that the non-enrollees who lived in the locality on April 1, 1970, were: Donald N. MacArthur, Sr. (non-Native father), Barney and Judy Sabo, and Bill and Betty Poe. However, they did not include the two Poe children, the one Sabo child (Ann), and Bob and Barbara Plouffe and their child whom B. G. Sabo affidavit and the BIA field notes (including interview of Ms. Plouffe) indicate were also residents on April 1, 1970. The Appellant has not specifically denied that such children and the Plouffes were residents on the critical date. Since the BIA's field investigation was more exhaustive than the MacArthur affidavits, BIA properly relied upon the results of such investigation as to the [**8] number of non-enrollee residents on April 1, 1970 (i.e., 14 non-enrollees as compared with 3 enrollees).

Finally, it is stated that the affidavit of Douglas MacArthur was ignored. This allegation is inaccurate inasmuch as the Investigative Findings (p. 8) state that "Douglas MacArthur did not return the affidavit sent him."

(Answer at 2-3).

[1] The issue is whether members of Little Lake Louise, Inc., constituted a majority of the residents of the group's locality on April 1, 1970. Appellant corporation and BIA differ over factual conclusions that may properly be derived from the affidavits of record. The Board's review of these affidavits, including BIA's own investigative findings, leads it to the conclusion that BIA's determination was correct. The Bureau's characterization of the evidence, quoted supra, is accepted as findings of the Board. The Area Director's certification of ineligibility for Little Lake Louise, Inc., is affirmed and the group's request for a hearing is denied. n1

   n1 Appellant's request for a hearing is appropriately addressed by intervenor as follows:

   "A hearing is necessary only where there is a material issue of fact requiring resolution through introduction of testimony or other evidence. *Kernco Drilling Company*, 71 IBLA 53, 56 (1983).

   "The appellants base their request for a hearing on the fact that conflicting affidavits were gathered by the

EXHIBIT 13
Page 3 of 9

BIA in its investigation of the eligibility of the groups. In other words, different people gave BIA different information. BIA made findings of fact based upon its evaluation of this information. Contrary to appellants' assertions, a hearing is not required merely because contradictory affidavits were obtained during the investigation. Precise allegations of error are required to place a factual matter at issue. See, *Oregon Wilderness Coalition, 71 IBLA 67, 70 (1983)*." (Intervenor's Answer at 1-2).

[**9]

[*287] Twin Lakes Native Group, Inc. AA-10437

The BIA determination that the Twin Lakes Native Group, Inc., was not eligible as a Native group under ANCSA, was based upon BIA's field investigation which revealed that on April 1, 1970, (1) the enrolled members of the group did not constitute a majority of the residents in the Twin Lakes locality, and (2) such enrolled members did not constitute more than a single family or household unit. The error asserted is that BIA incorrectly determined the number of Native and non-Native residents living in the locality. More specifically, the error asserted is that four enrollees, Rosie Ann Beeter and her three children, should have been included in the number of enrollees who were actually residing in the locality on April 1, 1970. Since the BIA determined that on such date there were 3 enrollee residents out of a total of 8 residents in the locality, the addition of 4 more enrollees (Beeters) as residents would render the group eligible by: (1) providing an additional family or household of enrollees; and (2) expanding the enrollee residents into a majority (7) of the total residents (12).

The appellant group correctly observes [**10] that there is a conflict between two affidavits by Rosie Beeter as to whether she and her children were actually residing in the Twin Lakes locality on April 1, 1970. We find Rose Beeter's first affidavit, dated September 15, 1978, and prepared with the assistance of an attorney, to be more credible. As summarized in BIA's answer, the record shows:

This earlier affidavit made it clear that Ms. Beeter left the locality in 1968 to live in Anchorage; and that since such time (including April 1, 1970), she resided in Anchorage, except for an annual hunting trip for several weeks in the Twin Lakes locality. In her later affidavit of September 23, 1982, in response to a BIA questionnaire, Ms. Beeter inconsistently stated that her residence on April 1, 1970 was "at Twin Lake mile post 29 on Nebesna Rd." (#2). However, a contemporaneous affidavit of enrollee Laura Hancock on September 23, 1982, stated that "Rosie Beeter and her children Ronnie Beeter, Daryl Beeter, and Jimmy Beeter stayed here in the summer" -- a questionable predicate for asserting the Twin Lakes locality, rather than Anchorage, to have been the "principal place of residence" required by 43 CFR 2653.6(a)(5). [**11] Furthermore, a letter of Mr. Douglas R. Frederick (a 20-year resident in the area) to the FBI, dated April 21, 1977, stated that the Beeters "have never lived at Twin Lakes." In consideration of Ms. Beeter's first affidavit, Laura Hancock's affidavit, and Mr. Frederick's statement, BIA was correct in concluding that the evidence preponderated in favor of Ms. Beeter's non-residence in the Twin Lakes locality on April 1, 1970.

It should be further noted that in her first affidavit of September 15, 1978, Ms. Beeter stated that she had the following three children whose ages were: Ronald-age 12[;] Daryl-age 8; and John Jr.-age 7. It not only appears that John Jr. could not have been an actual resident of the locality on April 1, 1970, but that Daryl also might not have been a resident on such date [*288] if he was born between April 1 and September 16, 1970. If this is the case, then the addition of Ms. Beeter and her son Ronald to the list of actual residents in the Twin Lakes locality on April 1, 1970, would be insufficient to make the Twin Lakes group eligible under ANCSA inasmuch as five (5) enrollees do not constitute a majority (6) of ten (10) residents in the locality. [Emphasis [**12] in original; footnote omitted.]

(Answer at 5-6).

The evidence of record, which we find is properly summarized by BIA, above, negates any need for a hearing and requires affirmance of the Area Director's determination. Whether Rosie Beeter was an actual resident of the Twin Lakes locality on April 1, 1970, is resolved by reliance on her first affidavit, the affidavit of Laura Hancock, and the

EXHIBIT 13
Page 4 of 9

statement of Douglas R. Frederick.

Lower Tonsina, Inc. AA-10535

The BIA determination that Lower Tonsina, Inc., was ineligible as a Native group under ANCSA was based on investigative findings that on April 1, 1970, the enrolled members of the group did not constitute a majority of the actual residents in the Lower Tonsina locality. Appellant group asserts that BIA incorrectly determined the number of Native and non-Native residents living in the locality.

Lower Tonsina, Inc., described its membership as consisting of four members, viz., Gordon Phillips, Eva Phillips, Oggie Mack, Jr., and April Rosemary Pogue. BIA's report summarizes the evidence regarding this group as follows:

None of [the] enrollees currently resides in the Lower Tonsina area. Two of these enrollees, Gordon [**13] Phillips and Oggie Mack, Jr., were interviewed in Anchorage, and both submitted affidavits (Exhibit 2, Appendix E). Eva Phillips, also an enrollee, is deceased. April Rosemary Pogue notified the Ahtna Corporation that she is not a member of the Lower Tonsina Group. This fact was telephoned to the ANCSA Office in October 1982 by the Ahtna Corporation. This information was communicated to Alaska Native Enrollment whose records show that Ms. Pogue is enrolled to Lower Tonsina. A copy of Alaska Native Enrollment's memorandum is attached (Exhibit 3, Appendix B). The affidavit sent to Ms. Pogue was never returned to the ANCSA Office.

In his affidavit, Oggie Mack, Jr., states that he was not a resident of Lower Tonsina on April 1, 1970.

(Report at 8).

BIA concluded that of the four persons named by the group as members thereof, only two were actual residents of the locality on April 1, 1970 (Report at 10). At least six, but possibly numerous other persons not enrolled in the group, wre found by BIA to have resided in the area on [*289] April 1, 1970 (Report at 9-10). On appeal, the appellant group submits that there is "considerable conflict as to non-enrollees and non-native [**14] residents as of April 1, 1970" and that "a fact finding hearing is necessary to accurately and fairly determine this figure" (Statement of Reasons at 7). We disagree. If anything, the discrepancies in question go to the margin by which the group's resident membership failed to constitute a majority of the residents of the group's locality. Again, we accept BIA's assessment of the case as set forth below:

Of the four (4) enrolled members of the group, two members, without contradiction, actually resided in the Lower Tonsina locality on the critical date of April 1, 1970. One of the four enrollees, Oggie Mack, stated in his affidavit that he was not actually residing in the locality on April 1, 1970. Another enrollee, April Rosemary Pogue, advised AHTNA Corporation (who relayed the information to BIA) that she is not a member of the Lower Tonsina group. However, whether the number of enrollees who resided in the locality on April 1, 1970, is two or is four, neither number constitutes a majority (5) of the minimal eight persons who the affidavits commonly stated to be actually residing in the locality on such date. The evidence acquired by BIA through affidavits and interviews [**15] strongly suggests that there was a total of 24 persons who were actually residing in the Lower Tonsina locality on April 1, 1970. However, even if we accept as true the Appellant's statement that there was a total of five residents in the locality on such date, the two remaining enrolled members who haven't disavowed their membership in the group or their residency on the critical date do not constitute a majority of the five-resident total. This appeal presents the weakest challenge to the BIA's factual findings, and a hearing should not be held where two of the four enrollees have removed themselves from consideration as residents on the critical date. [Emphasis in original.]

(Answer at 9-10).

Slana, Inc. AA-10536

EXHIBIT 13
Page 5 of 9

The BIA determination that the Slana Native Group Corporation was ineligible as a Native group under ANCSA was based upon BIA's field investigation which revealed that on April 1, 1970, the enrolled members of the group did not constitute a majority of the actual residents in the Slana locality. The error asserted is that BIA incorrectly determined the number of Native and non-Native residents living in the locality. More specifically, the error asserted [**16] is that nine enrollees, Irene Johnson and her children, were members residing in the locality on April 1, 1970. Since the BIA determined that on such date there were 4 enrolled residents out of a total of 17 residents in the locality, the addition of 10 more enrollees (9 Johnsons and Charlie Dewitt) would make the group eligible by expanding the enrolled residents into a majority (14) of the total residents (27).

[*290] It is true that the affidavit of enrollee Angus Dewitt states that the Johnson family actually resided in the Slana locality on April 1, 1970. However, the affidavit of enrollee Marianne Dewitt Pete does not include the Johnson family as having resided in the locality on April 1, 1970. More importantly, as BIA points out, the affidavit of Irene Johnson expressly states that she and her family "did not reside in the Group locality during the 1970 census" and that "we have a permanent address at 3571 Scarlet Place, Anchorage, Alaska 99503." n2 Therefore, even if Charlie Dewitt is added to the list of enrolled residents on April 1, 1970, the 5 enrolled residents would not constitute a majority of the 18 residents in the area.

> n2 Irene Johnson's affidavit states in full:
>
> "I, Irene Johnson, being first duly sworn, on oath, declare that:
>
> We have had trouble getting a hold of all of the group members. I am filling this out for everyone involved that have not filled their forms out.
>
> "We have had a roadhouse in Slana since around 1930. We do not actually reside in Slana but Irene Johnson, Merle Long, Amy John were born in Slana. Irene in April 15, 1926.
>
> "We did not reside in the Groups locality during the 1970 census. We now have a permanent residence at 3521 Scarlet Place, Anchorage, Alaska 99503.
>
> "Angus Dewitt and his brother Charlie Dewitt did stay in Slana during the 1970 census.
>
> "There are about 20-30 non-native residents living in the Slana area.
>
> "In the summers we use the roadhouse in Slana for fishing and for the group meetings that our group have.
>
> "Irene Johnson, 18 August 1978."

[**17]

In view of Irene Johnson's own disavowal of actual residency by her and her children in the group's locality on April 1, 1970, the correctness of BIA's ineligibility determination is clear. The group's request for a hearing is therefore denied.

General Assertions

As to all four cases, counsel for appellants argues BIA ignored the best evidence as to residency, violated trusteeship responsibilities contrary to section 2(b) of ANCSA *(43 U.S.C. § 1601*(b) (1982)), and ignored the due process rights of Natives. Finally, counsel contends inconsistencies between the Native village and the Native group residency regulations are contrary to congressional intent.

As we have already pointed out, the record demonstrates that BIA made a thorough attempt to ascertain the

EXHIBIT 13
Page 6 of 9

requisite facts, and its determinations are supported by the information it gathered. Appellants have not alleged specific facts which, if proved, would require reversal of the BIA decisions. Nor have appellants been deprived of due process. They were provided notice and given an opportunity to furnish information to aid BIA in its decision-making. They were also afforded a right of appeal to this Board.

[*291] [**18] Regarding the trust responsibility argument, the cited provision of ANCSA *(43 U.S.C. § 1601*(b) (1982)) reads:

(b) the settlement [of Native claims] should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska;

The intent of Congress in enacting this provision was to settle Native claims expeditiously without deciding difficult questions of existence of aboriginal title to Alaska lands. It was not Congress' intent to create a trust relationship between the United States and Native corporations created pursuant to ANCSA. *Cape Fox Corp. v. United States, 456 F. Supp. 784, 800 (D. Alaska 1978)* rev'd in part on other grounds, [**19] *646 F.2d 399 (9th Cir. 1981).* n3

> n3 BIA expands on the import of the Cape Fox decision, noting:
>
> "Section 2(b) of ANCSA [*43 U.S.C. § 1601*(b)] was also held in the same case to be a 'statement of policy (which) requires the Secretary to consult with Natives before making decisions affecting withdrawn and selected land' for Regional and Village corporations. *456 F. Supp. at 801.* See, 43 CFR 2650.1(a)(2) and 2650.4-3, relating to interim and other administration of such land. The so-called limited trusteeship ('met and conferred') does not relate to the process of investigating group eligibility. Accordingly, BIA's field investigation did not breach any trust responsibility, nor did it constitute a violation of due process under the Fifth Amendment of the U.S. Constitution."
>
> (Answer at 10-11).

[2] Finally, the argument relating to the inconsistency of eligibility regulations was addressed by the Board in *Chugach Natives, Inc., 80 IBLA 89, 94 (1984),* as follows:

Appellants' argument that the Group eligibility [**20] regulations should be declared invalid because they are inconsistent with the village eligibility regulations is without merit. The Board of Land Appeals has no authority to declare invalid duly promulgated regulations of this Department. Such regulations have the force and effect of law and are binding on the Board. *Sam P. Jones, 71 IBLA 42 (1983); Enserch Exploration, Inc., 70 IBLA 25 (1983); Altex Oil Corp., 61 IBLA 270 (1982).* [Complaint dismissed without prejudice in Altex Oil Corp. v. Watt, Civ. No. 82-0424A (D. Utah Oct. 19, 1982).]

[*292] Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decisions appealed from are affirmed.

Wm. Philip Horton
Chief Administrative Judge

**CONCURBY:** ARNESS; STUEBING

EXHIBIT 13
Page 7 of 9

We concur: Franklin D. Arness, Administrative Judge
Edward W. Stuebing, Administrative Judge.

EXHIBIT 13
Page 8 of 9

1298X7

********** Print Completed **********

Time of Request: Monday, March 19, 2007   15:21:20 EST

Print Number:    1822:18126163
Number of Lines: 287
Number of Pages: 8

Send To:   LEXIS.COM, 1298X7
           DEPT OF INTERIOR
           222 W 7TH AVE STOP 13
           ANCHORAGE, AK 99513-7504

EXHIBIT 13
Page 9 of 9