15 of 100 DOCUMENTS

CHUGACH NATIVES, INC., THE GROUSE CREEK CORP.

IBLA 83-991

Interior Board of Land Appeals

*80 IBLA 89; 1984 IBLA LEXIS 332*

March 30, 1984, Decided

**ACTION:**
[**1]

[*89] Appeal from determination of Area Director, Bureau of Indian Affairs, holding that The Grouse Creek Corporation is not a Native group eligible for land selection entitlement. AA-11203.

Suspended; hearing ordered.

**HEADNOTES:**

1. Alaska Native Claims Settlement Act: Conveyances: Native Groups

To establish its eligibility to select lands under the Alaska Native Claims Settlement Act, a Native group must constitute a majority of the residents in the locality. Where the record before the Board reveals disputed questions of fact as to the geographic boundaries of a Native group's locality as well as the resident population of the group on Apr. 1, 1970, the census enumeration date for determining Native group eligibility for land selection entitlement, the matter should be referred for hearing.

2. Regulations: Force and Effect as Law -- Regulations: Validity

The Board of Land Appeals has no authority to declare invalid duly promulgated regulations of this Department. Such regulations have the force and effect of law and are binding on the Department.

APPEARANCES:

Bart K. Garber, Esq., and Frederick H. Boness, Esq., Anchorage, Alaska, for Chugach Natives, Inc., and The Grouse Creek [**2] Corporation;

Dennis J. Hopewell, Esq., Office of Regional Solicitor, Anchorage, Alaska, for Bureau of Indian Affairs.

**OPINIONBY:** HORTON

OPINION BY CHIEF ADMINISTRATIVE JUDGE HORTON

On December 18, 1971, Congress passed the Alaska Native Claims Settlement Act (ANCSA), 85 Stat. 688, *43 U.S.C. §§ 1601*-1627 (1976), to provide a "fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." *43 U.S.C. § 1601*(a) (1976). As part of the claims settlement, *43 U.S.C. § 1613*(h)(2) (1976) (section 14(h)(2) [*90] of ANCSA) authorizes the Secretary of the Interior to "withdraw and convey to a Native group that does not qualify as a Native village, if it incorporates under the laws of Alaska, title to the surface estate in not more than 23,040 acres surrounding the Native group's locality" from "2 million acres of unreserved and unappropriated public lands located outside of the areas withdrawn by sections 1610 and 1615 of this title." "Native group" is defined in *43 U.S.C. § 1602*(d) (1976) as "any tribe, band, clan, village, community, or village association of Natives in Alaska composed of less than twenty-five Natives, who comprise a majority of the [**3] residents of the locality," and

EXHIBIT 14
Page 1 of 5

is distinguished from a "Native village" on the basis that the group has insufficient numbers to qualify as a village. Cf. *43 U.S.C. § 1602*(c) and (d) (1976). The Secretary has promulgated regulations regarding eligibility of Alaska Natives incorporated pursuant to section 14(h)(2) of ANCSA. Among other things, the regulations give an eligible Native group the right to select up to 7,680 acres of land. 43 CFR 2653.6(b).

The Grouse Creek Corporation (the Group) filed Native group application AA-11203 with the Alaska State Office, Bureau of Land Management (BLM), on June 30, 1976, pursuant to section 14(h)(2) of ANSCA, for 6,720 acres of land around the Grouse Creek area. The Group is located within the Chugach Natives, Inc. (Chugach), region.

A field investigation of the Group's locality was conducted on September 17 and 20, 1982, by a BIA realty specialist and a field investigator. Their findings are included in the Report of Investigation for the Grouse Creek Corporation BLM #AA-11203 (Report). The investigators found that there were 31 actual residents living in the Grouse Creek area on April 1, 1970; that the Group has 22 enrolled members; [**4] n1 that 11 of the enrolled Natives were present in Grouse Creek on April 1, 1970, while 2 were away at school and 2 were in military service on that date; that 6 of the enrolled Natives were living in LaFayette, Oregon (McCanna family); and that there were at least 20 people living in the area who were either white or non-enrolled Natives, including the Frazier family and the Munson family. The investigators made the following finding regarding the site boundaries for the Group:

> n1 On appeal, BIA explains that portions of BIA's report erroneously state that there are 21 members, but that reference to the enrollment list establishes that there are 22 members.

The site (use area) boundaries were determined following a transected reconnaissance of the site. As a result of the investigation, the site was delimited to W 1/2 SE 1/4, E 1/2 SW 1/4 Section 1, W 1/2 NE 1/4, E 1/2 NW 1/4, N 1/2 SW 1/4, NW 1/4 SE 1/4 Section 12, T. 1 N., R. 1 W., SM, Alaska. Grouse Creek is located 6 3/4 miles north of Seward, Alaska.

(Report [**5] at 8). Assuming that these are regular subdivisions, a parcel of 440 acres is described.

[*91] By decision dated June 17, 1983, the Area Director, Bureau of Indian Affairs, found the Group to be an ineligible Native group because the members thereof did not constitute a majority of the residents of the locality where the Group resided on April 1, 1970, as required by 43 CFR 2653.6(a)(4).

Appellants object to the Area Director's determination and have raised the following three issues on appeal.

1. Whether the Area Director arbitrarily and capriciously delimited the boundaries of the Group locality.

2. Whether the Henry Munson family members were properly considered residents of the Group locality on April 1, 1970, when they were enrolled in another village and region, pursuant to section 5(b) of ANCSA.

3. Whether the Native group eligibility regulations are invalid because they impose additional restrictions on Native groups that are not applied to Native villages.

Appellants' Argument

With respect to residency, appellants contend that 15 members of the Group's enrollment of 22 Natives (a majority) resided in the Group locality on April 1, 1970; that 2 of the resident [**6] members were away at school; that another 2 members were enlisted in the armed forces while maintaining their residence in the Grouse Creek locality; that only 9 non-Natives resided in the Group locality on April 1, 1970; and that 5 Natives in the locality (the Munson family members), who are not enrolled in the Group, are enrolled in a village in a region other than Chugach, pursuant to section 5(b) of ANCSA, and therefore should not be considered legal residents of the Group's locality. n2

> n2 Appellants allege that the Munsons cannot legally reside in two locations simultaneously, noting that under the provisions of 43 CFR 2651.2(b)(1) "[a] Native properly enrolled to the village shall be deemed a resident of the village [on Apr. 1, 1970]." 25 CFR 69.1(k).

EXHIBIT 14
Page 2 of 5

Concerning the boundaries of the locality, appellants note that BIA stated in its report that "[t]he Grouse Creek Corporation claimed the area along the Seward-Anchorage Highway from mile 6 3/4 to mile 8 as their Native group locality" (Report at 8). According to [**7] appellants, however:

Actually, the Group claimed the area from mile 7 to mile 8 as their locality. See, Exhibit A. Mile 7 is the approximate location of the Esther Ronne residence which is the southern boundary of the Group locality. Mabel Ronne, another group member, resides the farthest north along the highway. Mabel's house marks the Group's north boundary. No other residences are located near the north boundary of the locality.

[*92] William Frazier's house is the nearest residence to the south boundary of the Group locality. His house is located at approximately mile 6 3/4 on the Seward Highway. The BIA, however, determined that the Frazier house is located within the boundaries of the Group locality. The six members of the Frazier family increased the number of total residents of the locality enough to cause the Group to be certified as ineligible.

(Statement of Reasons at 5).

Appellants refer to regulations 43 CFR 2653.6(a)(4) and (5) which govern the location of Native group locality boundaries:

(4) * * * The [BIA] shall determine and identify the exterior boundaries of the Native group's locality and the location of all those permanent structures of the [**8] Native group used as dwelling houses.

(5) The Native group must have an identifiable physical location. The members of the group must use the group locality as a place where they actually live in permanent structures used as dwelling houses.

These regulations are interpreted by appellants to mean that a Native group's locality is the area bounded by the location of the group members' permanent homes. Therefore, appellants submit that the boundaries of the locality are to be defined by the outer limits of the group members' property. Appellants note that BIA did not express any reason for expanding the boundaries in this case to include the Frazier family residence.

For the proposition that the Frazier family is not a part of the Grouse Creek locality, appellants refer to circumstances surrounding attempts by the unincorporated community of Woodrow, which abuts the southern border of the locality, to become a second-class city. In 1977, the residents of Woodrow petitioned the State of Alaska for second-class city status. William, Martha, and Patricia Frazier all signed the Woodrow petition identifying themselves as resident voters of the Woodrow area. BIA did not include the [**9] residents of the Woodrow area among the residents of the Group locality. Since there is a strong indication that the Fraziers actually consider themselves residents of the Woodrow area, appellants contend that BIA's decision to include them in the count of residents in the Grouse Creek locality was error and caused the Group to be certified as ineligible.

Appellants request the Board to reverse the Area Director's decision and/or order a hearing for determination of the residency claims.

Finally, appellants object to the regulations under which the Area Director declared the Group ineligible. It is contended that the regulations impose additional restrictions on Native groups not applied to Native villages. Appellants argue that no statutory basis justifies the distinction and, therefore, the Group eligibility regulations should be invalidated. Appellants [*93] point out that neither the statutory provision for a Native village nor the statutory provision for a Native group requires the Native resident to be enrolled in the village or group for the purpose of determining the village or group's eligibility. The village eligibility regulations require non-Native residents [**10] of the village to be counted against the village for the purpose of determining Native village eligibility whereas the Group eligibility regulations require nonenrolled Native residents to be counted against the Group. n3

n3 Appellants contend that the Group is eligible under the village eligibility regulations because (1) the five Munsons could be counted along with the Group members under 43 CFR 2651.2(b)(1) depending on their grounds for enrollment in the other village and region, and (2) the seven nonresident McCannas, who are properly enrolled to the Group, could be counted as residents of the locality under 43 CFR 2651.2(b)(4).

Discussion

EXHIBIT 14
Page 3 of 5

BIA acknowledges that a factual hearing is appropriate in this case to resolve the correct delineation of the boundaries of the Group's locality and the conflicting residency claims.

As for the residency of the Munsons, BIA states that residency requirements for village enrollment and the determination of group member majority are quite different and that it is possible for [**11] a person to be enrolled in a village and still be counted as a resident in a group's locality. BIA states this is because the definition of "permanent resident" for village enrollment purposes does not require actual residence while the Native group regulations do require actual, physical residence. See 25 CFR 69.1(k) and 43 CFR 2653.6(a)(5). The fact that the Munsons are enrolled in a village away from the Group's locality does not, according to the Bureau, mean that the Munsons cannot be counted as residents of the Group's locality on April 1, 1970. BIA asserts the pertinent factual issue to be where the five Munsons actually resided on April 1, 1970. We agree.

We also agree with BIA that it is possible for members away at school or in military service to be counted as residents of a Native group, but that the question of whether any of the four absent members in this case should be counted as group residents is a factual issue suited to an evidentiary hearing.

With respect to the alleged invalidity of the Native group regulations, BIA responds that the stricter standards for Native group eligibility are not improper and that, in any event, such regulations are binding [**12] on the Board.

[1] Due to the factual questions raised in this case, it is clear that a hearing is necessary.

As to the issue of locality, the Board has recognized in prior cases that the inquiry is factual and that where the facts are in doubt, a hearing is appropriate. *Tanalian, Inc., 75 IBLA 316 (1983)*. Referring the above case for hearing, the Board stated:

[*94] The delineation of "the locality" in which the Tanalian members reside is the first issue to be resolved upon hearing. This Board holds as a matter of law that the census of persons in the locality, for the purpose of determining Tanalian's eligibility, cannot be confined to the patented 153 acres of U.S. Survey 3434 known as "the Alsworth homestead" and occupied in 1970 exclusively by the Alsworth families. The "locality" must encompass the greater area in which other residents live in relative proximity, as compared with the population density of lands beyond the area so designated. Evidence of the extent to which residents of the area share common interests or concerns in the local amenities, facilities, and services may be received as indicative of the geographic area of the locality. "Locality" has [**13] been held to be synonymous with "community." *Conley v. Valley Motor Transport Co., 139 F.2d 692, 693 (6th Cir. 1943)*. It means the place, near the place, vicinity, or neighborhood. *Connally v. General Construction Co., 269 U.S. 385 (1926)*. A considerable degree of discretion is vested in the Secretary to determine what shall constitute a locality for a particular purpose. *Covington Mills v. Mitchell, 129 F. Supp. 740, 742 (D.D.C. 1955)*. The term must be construed so as to effectuate Congress' intention. *Conley v. Valley Motor Transport Co., supra*. The error of BIA in initially restricting its definition of "locality" to the boundaries of the patented Alsworth homestead is not binding on the Department.

Id. at 320, 321.

As in Tanalian, Inc., the first issue which should be resolved upon hearing in this matter is the determination of the Group's "locality." It should then be determined whether the Group members constituted a majority of the residents of the locality on April 1, 1970. This necessitates a determination of those group members who "actually have resided there as of the 1970 enumeration date." 43 CFR 2653.6(a)(5).

[2] Appellants' [**14] argument that the Group eligibility regulations should be declared invalid because they are inconsistent with the village eligibility regulations is without merit. The Board of Land Appeals has no authority to declare invalid duly promulgated regulations of this Department. Such regulations have the force and effect of law and are binding on the Board. *Sam P. Jones, 71 IBLA 42 (1983); Enserch Exploration, Inc., 70 IBLA 25 (1983); Altex Oil Corp., 61 IBLA 270 (1982)*. n4

n4 Complaint dismissed without prejudice in Altex Oil Corp. v. Watt, Civ. No. 82-0424A (D. Utah Oct. 19, 1982).

If the Administrative Law Judge determines that the Group did not constitute a majority of the locality as of the census enumeration date, he shall affirm BIA's recommendation to deny the Group's application. If he finds that the

EXHIBIT 14
Page 4 of 5

Group did, in fact, constitute the majority of the locality as determined, BIA should be ordered to certify the Group as eligible, assuming all other requirements are met.

[*95] Accordingly, [**15] pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision appealed from is suspended and the case is referred to the Hearings Division for assignment to an Administrative Law Judge, who will inform the parties regarding further procedures. The Administrative Law Judge's decision will be final for the Department, absent an appeal to the Board within 30 days from receipt of the decision.

Wm. Philip Horton
Chief Administrative Judge

**CONCURBY:** IRWIN; STUEBING

We concur: Will A. Irwin, Administrative Judge
Edward W. Stuebing, Administrative Judge.

EXHIBIT 14
Page 5 of 5